No. 76,296

James N. Kinder III, *Appellant*, v. Murray & Sons Construction Co., Inc., and Continental National America Group, *Appellees*.

(957 P.2d 488)

Opinion filed April 17, 1998.

*Beth Regier Foester* of McCullough, Wareheim & LaBunker, P.A., of Topeka, argued the cause and was on the briefs for appellant.

*Gary R. Terrill*, of Wallace, Saunders, Austin, Brown and Enochs, Chartered, of Overland Park, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

Allegrucci, J.: James Kinder, a cement mason, filed a workers compensation claim against Murray & Sons construction Company, Inc., (Murray & Sons) and its insurer, Continental National American Group (Continental), for a knee injury. On the ground that Kinder was employed only by Murray & Sons on the day of his injury, the administrative law judge (ALJ) found that Kinder was not engaged in multiple employment within the meaning of K.S.A. 44-511(b)(7) and computed Kinder's compensation benefits under K.S.A. 44-511(b)(4)(A) and (b)(5) as if he were a part-time hourly employee. The Workers Compensation Board (Board) af-

firmed the award, and the Court of Appeals affirmed the Board's decision in an unpublished *per curiam* opinion filed May 23, 1997. Kinder's petition for review was granted.

Kinder agrees with the facts as stated by the Court of Appeals:

"Kinder injured his right knee on December 23, 1992, when he jumped off the steps he was working on at Washburn University while doing a concrete finishing job for Murray & Sons. The nature and extent of his injury is not an issue in this appeal and was deemed to be a 10 percent permanent partial general disability of the leg, a scheduled injury.

"Kinder had worked as a concrete finisher on several different jobs for different employers at different times during 1992 in the months preceding his injury. When a particular company needed someone to lay cement, it might contact Kinder to do the work. Kinder testified he had been a cement mason for 24 years and used his own tools. Different construction companies would contact him and tell him they had a job, and, upon accepting a job and showing up for work, he would just work until the job was finished; jobs typically lasted 1 or 2 days. These companies always paid Kinder by the hour, although the rates in 1992 varied from $14.25 to $13.30 to $13.10 per hour, depending on the employer. The Washburn University job that Kinder was hired by Murray & Sons to complete lasted 8 hours and Kinder was paid $13.10 per hour. On the date of his injury, Kinder was not employed by any company other than Murray & Sons. In an award dated July 25, 1995, the ALJ determined that there was an employer-employee relationship between Kinder and Murray & Sons and that the injury arose out of an accident which occurred in the course of that employment. Those findings are not at issue in this appeal.

"The ALJ also determined that Kinder was only employed by one company, Murray & Sons, on the date of his injury. Because Kinder was not concurrently employed with any other company on the day of his employment with Murray & Sons, the ALJ found that he was not engaged in multiple employment within the meaning of K.S.A. 44-511(b)(7). Kinder's average weekly wage was figured by determining how much he earned from Murray & Sons during the 26 weeks preceding his accident ($1,414.80) and dividing this sum by the number of weeks in which Kinder had worked for Murray & Sons: 9 weeks. Thus, Kinder's average gross weekly wage was set at $157.20, and the amount of his award was determined on that basis. This reasoning and conclusion was affirmed by the Board."

Kinder's workers compensation benefits were calculated as a percentage of his average gross weekly wage, which was determined by the ALJ on the grounds that Kinder was a part-time hourly employee who was not engaged in multiple employment. According to the Court of Appeals,

"[n]either the ALJ nor the Board specifically stated that Kinder's employment with Murray & Sons was part-time rather than full-time. However, that appears to have been the conclusion of the ALJ and the Board in light of the method chosen to figure Kinder's average weekly wage. The method chosen fits the method specified in K.S.A. 44-511(b)(4)(A) and (b)(5) for part-time hourly employees."

Kinder's theory of recovery throughout the administrative proceedings and on judicial appeal was that he was a part-time hourly employee engaged in multiple employment. K.S.A. 44-511(b)(7) defines and governs multiple employment, which, by definition, involves part-time work. The sole issue Kinder raises in this court is whether the multiple employment provision may be construed to include Kinder and thereby increase his compensation benefits.

A part-time hourly employee's average gross weekly wage is computed according to K.S.A. 44-511(b)(5), which provides, in part:

"If the employee had been in the employment of the employer less than one calendar week immediately preceding the accident, the average gross weekly wage shall be determined by the administrative law judge based upon all of the evidence and circumstances, including the usual wage for similar services paid by the same employer, or if the employer has no employees performing similar services, the usual wage paid for similar services by other employers. The average gross weekly wage so determined shall not exceed the actual average gross weekly wage the employee was reasonably expected to earn in the employee's specific employment, including the average weekly value of any additional compensation and the value of the employee's average weekly overtime computed as provided in paragraph (4) of this subsection. In making any computations under this paragraph (5), workweeks during which the employee was on vacation, leave of absence, sick leave or was absent the entire workweek because of illness or injury shall not be considered."

The ALJ determined that Kinder's average gross weekly wage was $157.20. The ALJ expressly found that the multiple employment provision, K.S.A. 44-511(b)(7), did not apply to Kinder. It provides:

"(b) The employee's average gross weekly wage for the purpose of computing any compensation benefits provided by the workers compensation act shall be determined as follows:

. . . .

(7) The average gross weekly wage of an employee who sustains an injury by accident arising out of and in the course of multiple employment, in which such

employee performs the same or a very similar type of work on a part-time basis for each of two or more employers, shall be the total average gross weekly wage of such employee paid by all the employers in such multiple employment. The total average gross weekly wage of such employee shall be the total amount of the individual average gross weekly wage determinations under this section for each individual employment of such multiple employment."

According to the Court of Appeals, "Kinder's average [gross] weekly wage was figured by determining how much he earned from Murray & Sons during the 26 weeks preceding his accident ($1,414.80) and dividing this sum by the number of weeks [during the 26-week period] in which Kinder had worked for Murray & Sons: 9 weeks." The average gross weekly wage determined by the ALJ for Kinder, $157.20, would amount to annual earnings of approximately $7,860. It would be $3.93 per hour for a 40-hour week. None of these figures bears any relation to Kinder's actual earnings.

At the hearing before the ALJ, Kinder was asked how he got jobs. He stated, "Well, they call my brother. He contacts us, tells us where to go, what time to be there." He said that it was "very common" for him to be required to report for work at 8 a.m. The customary work day lasted 8 hours, from 8 a.m. to 4:30 p.m. Kinder's handwritten job ledger for December 1991 through 1992 was admitted at the hearing, and it is included in the record on appeal. Among the employers listed, several appear over and over. Examination of the ledger shows that Kinder customarily worked for only one company per day. The great majority of entries for number of hours worked per day is 8 hours. Kinder was asked:

"Q.   It appears that, for the most part, all of the employers you worked for in the one year before your accident you'd worked for them eight hours per day; is that correct?
"A.   Yes.
"Q. But again, you didn't work for any of these employers at the same time?
"A. No."

Although Kinder testified that his hourly rate of pay ranged from $13.10 to $15, he concurs in the Court of Appeals' statement that the range was from $13.10 to $14.25. The transcript of the hearing shows that his 1992 W-2 form from Murray & Sons reported wages of $36,641.80 paid by that company to Kinder. The correct figure

is $3,641.80. Kinder's ledger shows that he worked approximately 1,950 hours during 1992. The pay for 1,950 hours at a rate of $13.10 would be $25,545. The record on appeal contains 10 W-2 Wage and Tax Statements completed for Kinder for 1992. Wages reported by the 10 employers total $25,403.45.

If the ALJ had applied the multiple-employment provision in calculating Kinder's average gross weekly wage, there would have been a significant difference because his earnings from other employers would have been aggregated with his earnings from Murray & Sons. In the words of 44-511(b)(7), the average gross weekly wage "shall be the total amount of the individual average gross weekly wage determinations under this section for each individual employment of such multiple employment." Kinder worked for at least 10 employers in the 26 weeks preceding his injury. The average gross weekly wage for each of these employers would be calculated the way the ALJ figured Kinder's average gross weekly wage from Murray & Sons, that is, by dividing how much Kinder earned from each during the 26 weeks preceding his accident by the number of weeks in which he had worked for each. Assuming those earnings were $12,700, which is approximately one-half of Kinder's 1992 earnings as reported on his W-2 form, the sum of the individual average gross weekly wage determinations, rounded to the nearest dollar, is $488.

Kinder's compensation benefits were calculated according to K.S.A. 44-510c, which provides that the amount of his weekly payments would be 66 $2/3$% of his average gross weekly wage. With his average gross weekly wage set at $157.20, his weekly benefits amounted to roughly $105. If his average gross weekly wage had been set at $488, his weekly benefits would have been roughly $325.

The ALJ's pertinent finding states: "Claimant was not employed in multiple employment at the time of the accident. He was only employed by the respondent and his average weekly wage was $157.20, at the time of the accident." The Board agreed:

"Although the evidence in this case established that the claimant had worked for various employers prior to the date of accident, the Appeals Board finds that on the date of accident he was only employed by one employer, the respondent.

Accordingly, since the claimant's accidental injury did not arise out of and in the course of multiple employment, his average weekly wage should be based only on his employment with the respondent."

The Court of Appeals engaged in a discussion of the history of the multiple employment provision in the Workers Compensation Act:

"The first Kansas Workers Compensation Act, enacted in 1911, was modeled after the British Act and included the following language:

' " '(b) Where the workman had entered into concurrent contracts of service with two or more employers under which he worked at one time for one such employer and at another time for another such employer, his "earnings" and his "average earnings" shall be computed as if his earnings under all such contracts were earnings in the employment of the employer for whom he was working at the time of the accident.' " ' [*Wade v. Union Nat'l Bank*, 10 Kan. App. 2d 645, 647, 707 P.2d 1087, *rev. denied* 238 Kan. 879 (1985)] (quoting *Walters v. Greenland Drilling Co.*, 184 Kan. 157, 159, 334 P.2d 394 [1959]).

"This section was eventually numbered section 44-511 in the Revised Statutes of 1923 and has retained that designation to the present time. 10 Kan. App. 2d at 647 (citing *Walters*, 184 Kan. at 159-60).

"In 1933, the legislature amended section 44-511 by removing the wage aggregation provisions taken from the British Act and by providing that average weekly wage would be based only on those wages earned from the employer in whose service the employee was acting at the time of his injury. See, generally, *Wade*, 10 Kan. App. 2d at 647-48.

"However, during a general overhaul of the Kansas workers compensation system in 1974, K.S.A. 44-511 was amended to include, among other things, the current language of K.S.A. 44-511(b)(7), which allows for wage aggregation in certain cases. L. 1974, ch. 203, § 18.

"After noting the above history, the court in *Wade* determined that K.S.A. 44-511(b)(7) did not apply to full-time workers who also hold one or more part-time jobs, stating:

'Initially, we note that when the legislature, in 1911, intended aggregation of all wages in all multiple employment cases, it clearly knew how to and did say so. After later deleting this provision entirely [in 1933], the 1974 legislative body reinstated the aggregation clause, but only for those workers employed by two or more employers *on a part time basis.*'

'Additionally, our independent research of the legislative history of K.S.A. 44-511(b)(7) reveals the following notation in the October 17, 1973, minutes of the committee which recommended its passage:

" '[The subsection provides that] a worker who is employed by more than one employer but in similar type work be compensated to reflect his average work week and not the number of hours of just one employer. (*Specific exception was*

*made for anyone considered moonlighting.*)" Emphasis added.' 10 Kan. App. 2d at 648-49.

"The *Wade* court then held that the multiple employment wage aggregation authorized under K.S.A. 44-511(b)(7) applies only to workers employed exclusively in part-time employments of a similar nature. 10 Kan. App. 2d at 649.

'[W]here Wade was employed full time for the police department and part time for the hospital and the bank (where the injury occurred), we conclude that no aggregation of wages is authorized and that the trial court correctly computed Wade's compensation based upon his bank wages alone.' 10 Kan. App. 2d at 649."

The Court of Appeals concluded:

"The language of 44-511(b)(7) fairly implies a requirement that the part-time employment relationships referred to in that subsection must all be in force at time of the accident. K.S.A. 44-511(b)(7) does not use the word 'concurrent' whereas the 1911 wage aggregation statute did. However, the wording of 44-511(b)(7) is different from the 1911 statute in many ways, not all of which amount to substantive changes. For example, the fact that the average wages from all of the employments are supposed to be combined is expressed in the language of both statutes but with different words. We believe the legislature did not intend to remove the 'concurrently' requirement by changing the wording of the statute, but rather it meant to convey the same meaning using different words."

The key to the Court of Appeals' rationale lies in its view that "K.S.A. 44-511(b)(7) states that the injury occurs 'in the course of multiple employment.' " To the Court of Appeals, this means that when the worker was injured he or she was "in an employer-employee relationship" with more than one employer. In other words, the worker must have an existing employment contract with each employer to qualify for benefits under 44-511(b)(7).

Under this reasoning, a gardener who contracted with five different corporations to provide lawn care on a regular 1-day-a-week basis would be "in an employer-employee relationship" with more than one employer. Thus, if injured while working at Corporation A on Monday, the gardener would be eligible for wage aggregation under the multiple employment provision. Even though he was not performing work for Corporations B through E at the time when the injury occurred, the wages they have paid the gardener in the 26 weeks preceding the injury would be included in computing his average gross weekly wage (and, hence, compensation benefits), and Corporations B through E each would be liable to

pay a proportionate amount of the compensation under K.S.A. 44-503a. This method of computing the worker's compensation and of apportioning the liability among the worker's employers accurately reflects the inherently full-time nature of the worker's work and the worker's status as a part-time worker with each of several employers.

The Court of Appeals' rationale and conclusion fail to provide an accurate match between Kinder's compensation and his employment circumstances. Because he worked on an as-needed basis for multiple employers rather than on a contractual basis, on any given day he was "in an employer-employee relationship" with no more than one employer. Thus, under the Court of Appeals' interpretation of the statute, the inherently full-time nature of his work counts for nothing when he is injured. The goal of restoring to him some semblance of the earning power he lost as a result of injury is lost in this unduly narrow construction. The Court of Appeals stated that "the 'in the course of multiple employment' language arguably implies that the worker was at least in an employer-employee relationship with each of the employers referred to in 44-511(b)(7) when the injury occurred." The only authority cited, however, is a treatise, 2 Modern Workers Compensation § 201:7, p. 17 (1993), which cites 44-511(b)(7) for a different proposition. The concept under discussion in the treatise is similarity of tasks performed for more than one employer. In the same paragraph, the Court of Appeals cited *Newman v. Bennett*, 212 Kan. 562, 566, 512 P.2d 497 (1973). The worker in that case was an oil field pumper who was hired separately for each of six separately owned oil and gas leases to check and service the wells on each of the leases every day. He was killed while driving his truck, apparently on his way to one of the leases, but which one could not be determined. The principal issue on appeal was whether the accident arose in the course of employment. Once that issue had been decided in favor of the worker's widow, the court turned to the secondary issue of apportionment of the award among the employers. Liability was apportioned "on the basis of the percentage of total wages each paid to the decedent." 212 Kan. at 569. Although there was no provision in the Workers Compensation Act for wage ag-

gregation at the time of Newman's death, his benefits were based on his total earnings. Thus, if any lesson can be drawn from *Newman* for application in the present case, it would seem to be the liberality with which the court has construed the Act to ensure fair compensation for workers whose employment circumstances do not fall within a strict norm.

The only other source cited by the Court of Appeals for its construction of the multiple employment provision is Herrington, *Workmen's Compensation—Major Changes in Employments Covered, Benefits, Defenses, Offsets, and Other Changes*, 24 Kan. L. Rev. 611 (1976). Writing shortly after the legislature overhauled the Act and restored the wage aggregation provision to it, the commentator borrowed from the opinion in *Newman* to illustrate its application: "An example might be an oil field pumper who is not an independent contractor and who works for more than one employer. If the accident clearly arose out of and in the course of employment for one particular employer, that employer would be solely responsible; otherwise, all employers would be liable for a proportionate amount of the compensation." 24 Kan. L. Rev. at 621. In *Newman*, the court stated:

"We must agree with the comments made by the examiner and the director that, generally speaking, had the accident occurred upon the premises of one specific lease then that particular lessee would have been solely responsible for the compensation [citation omitted]; however, that is not our situation where the accident occurred 'off premises' and was not clearly identifiable with any particular employer but nonetheless arose out of and in the course of multiple employment with all employers." 212 Kan. at 569.

Herrington's use, without attribution, of a case based on pre-1974 law for interpretation of a provision added in 1974 undermines his credibility.

*Wade v. Union Nat'l Bank*, 10 Kan. App. 2d 645, 707 P.2d 1087, *rev. denied* 238 Kan. 879 (1985), is identified by the Court of Appeals as "the only Kansas case interpreting K.S.A. 44-511(b)(7)." Wade was employed full time for the police department, and he moonlighted for a hospital and a bank. He was injured while working at the bank, and his compensation benefits were based on his bank wages only. The key to the Court of Appeals' affirmation of

the award was the following notation from minutes of the legislative committee that recommended passage of 44-511(b)(7): " '[The subsection provides that] a worker who is employed by more than one employer but in similar type work be compensated to reflect his average work week and not the number of hours of just one employer. (*Specific exception was made for anyone considered moonlighting*.)' Emphasis added." 10 Kan. App. 2d at 649. On the basis of this legislative history, the Court of Appeals construed the multiple employment provision to "appl[y] only to workers employed exclusively in part-time employments of a similar nature and [not to] apply to workers employed on a full-time basis who also 'moonlight' part time." 10 Kan. App. 2d at 649. In other words, *Wade* has no application in the circumstances of the present case.

Appellees' argument goes much further than the Court of Appeals' reasoning. Where the Court of Appeals would aggregate wages of a worker under contract with more than one employer but performing services for only one employer at the time of the injury, appellees would aggregate wages only if the injury occurred while a worker was performing work for more than one employer. They do not offer an example of this multiple-employment arrangement.

"The goal of workers' compensation is to restore earning power lost as a result of injury. *Anderson v. Kinsley Sand & Gravel, Inc.*, 221 Kan. 191, 194, 558 P.2d 146 (1976)." *McMechan v. Everly Roofing, Heating & Air Conditioning, Inc.*, 8 Kan. App. 2d 349, 351, 656 P.2d 797, *rev. denied* 233 Kan. 1092 (1983). In furtherance of that goal, this court has long adhered to a rule of liberally construing the workers compensation act in favor of the worker. A 1939 opinion contains this statement: "[T]his court has frequently said that the workmen's compensation act should be liberally construed to effectuate its purposes. (*Roberts v. City of Ottawa*, 101 Kan. 228, 165 Pac. 869; *Palmer v. Fincke*, 122 Kan. 825, 253 Pac. 583; *Rush v. Empire Oil & Refining Co.*, 140 Kan. 198, 200, 34 P.2d 542.)" *Chamberlain v. Bowersock Mills & Power Co.*, 150 Kan. 934, 944, 96 P.2d 684 (1939). More recently, in *Nordstrom v. City of Topeka*, 228 Kan. 336, 613 P.2d 1371 (1980), this court stated:

"The court is firmly committed to the rule of liberal construction of the workmen's compensation act in order to award compensation to the workman when it is reasonably possible to do so." Syl. ¶ 2.

"When a workmen's compensation statute is subject to more than one interpretation, it must be construed in favor of the workman if such construction is compatible with legislative intent." Syl. ¶ 3.

In interpreting a statute, the fundamental rule is the intent of the legislature, where it can be ascertained, governs. When a statute is plain and unambiguous, we will not speculate as to the legislative intent behind it or read such statute so as to add something not readily found in the statute. *State v. Lawson*, 261 Kan. 964, 966, 933 P.2d 684 (1997). "When the legislature revises an existing law, it is presumed that the legislature intended to change the law as it existed prior to the amendment." *State v. Clint L.*, 262 Kan. 174, Syl. ¶ 2, 936 P.2d 235 (1997).

Bearing in mind these construction rules and the principle that the award ought to approximate the injured worker's earning power, which was impaired because of the injury, we turn to the pertinent portion of the statute, which states:

"The average gross weekly wage of an employee who sustains an injury by accident arising out of and in the course of multiple employment, in which such employee performs the same or a very similar type of work on a part-time basis for each of two or more employers, shall be the total average gross weekly wage of such employee paid by all the employers in such multiple employment." K.S.A. 44-511(b)(7).

We find no reason to go beyond a plain reading of the above provision to determine its meaning. With respect to who is eligible for wage aggregation, the statute identifies a part-time employee who performs the same or similar work for more than one employer. Kinder fits that category. With respect to eligibility for benefits, the statute provides that the employee's injury be the result of accident arising out of and in the course of multiple employment. The statute reasonably can be read to define multiple employment as employment for one or more employers in which the employee performs the same or similar work on a part-time basis for each. The Court of Appeals required the extra burden of qualification—that the employee be under contract with more than one

employer at the time of the injury. That interpretation requires the reader to derive a definition of multiple employment from the words that precede the phrase rather than from the dependent clause that follows it. In other words, it would define "multiple employment" as some form of employment out of which the injury arose and it would condition eligibility for wage aggregation on the multiple employment requiring the same or similar work. The Court of Appeals' rationale is dependent upon its belief that although the legislature deleted "concurrent," it nevertheless did not intend to change the meaning of the statute. Thus, the Court of Appeals added the requirement that the employee be under contract with more than one employer at the time of the injury. There is nothing in the statute which imposes such a requirement, and we will not speculate that one was intended by the legislature. Further, the legislature, in amending the statute, evidences an intent to change the law as it existed prior to the amendment. Moreover, it is the unique nature of Kinder's trade that dictates the arrangement he has with his employers. If the legislature intended to exclude workers like Kinder who do not have an express contract with each employer, it certainly knows how to do so.

We hold that pursuant to K.S.A. 44-511(b)(7), Kinder was engaged in multiple employment and was entitled to have his benefits computed accordingly. The judgment of the Court of Appeals affirming the Workers Compensation Board is reversed, and the case is remanded to the ALJ with directions to enter an award in conformity with this opinion.